**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Melinda Lou Armer,<br><br>        Plaintiff,<br><br>v.<br><br>CSAA General Insurance Company,<br><br>        Defendant. | No. CV-19-04402-PHX-DWL<br><br>**ORDER** |

Pending before the Court is Defendant CSAA General Insurance Company's ("CSAA") motion to preclude the experts retained by Plaintiff Melinda Armer from offering certain opinions at trial. (Doc. 65.) For the following reasons, the motion will be granted in part and denied in part.

## BACKGROUND

I.    <u>Factual Background</u>

On December 18, 2017, Armer went to the doctor with complaints of hip pain. (Doc. 66 at 2.) At the time of the visit, Armer was 72 years old. (*Id.*) During the visit, x-rays were taken of Armer's pelvis. (*Id.*) Although the one-paragraph report summarizing the x-rays "did not report any specific findings regarding Ms. Armer's pelvis" (*id.*, citing Doc. 66-1),[1] the actual x-rays depict a fracture of the pelvic bone (also known as the pubis).

---

[1] Specifically, the summary states: "Diagnostic Results AP pelvis and frog leg lateral views of the left hip performed in the office today demonstrate normal alignment of the femoral acetabular joints that are equal bilaterally. I do not appreciate any osteophytes or narrowing at the joint space. There is enthesopathy at the insertion on the greater tuberosity." (Doc. 66-1.)

On January 31, 2018—a little over a month after the doctor visit—Armer was involved in a car accident. (Doc. 1-3 ¶¶ 5-6.) A post-accident CT scan identified pelvic and rib fractures. (Doc. 66 at 2.) However, one of the doctors at the hospital commented that the pelvic fracture "might actually be old." (Doc. 66-8 at 4.)

The driver that struck Armer was fully responsible for the accident, and that driver's insurance company paid $25,000 to Armer, which was the driver's policy limit. (Doc. 65-5 at 2; Doc. 66-5 at 3.)

In September 2018, Armer, with the assistance of counsel, filed a claim with her insurer, CSAA, for $100,000, which was the policy limit of her underinsured motorist coverage. (Doc. 66-2 at 1; Doc. 66-10 at 3.) In the demand letter, Armer's counsel asserted that Armer's damages exceeded $100,000 in part because she "did not have a pre-existing pelvic or hip fracture at the time of the crash." (Doc. 66-2 at 1. *See also* Doc. 65-7 at 3 [email from Armer's counsel to CSAA's counsel dated Oct. 3, 2018: "Ms. Armer's pre-accident x-rays showed a healthy pelvis"].) Notably, Armer's counsel hadn't actually obtained or reviewed the x-rays from Armer's December 2017 visit to the doctor (which, as noted, depict a pre-existing fracture) at the time he made these statements. (Doc. 66 at 5.) Instead, Armer's counsel had only seen the one-paragraph summary report, which did not mention a fracture. (*Id.*)

In response to Armer's demand, CSAA asked for Armer's pre-accident medical records and a medical release. (Doc. 11 at 4.) However, despite multiple requests beginning in October 2018, "[n]o authorization or additional records were ever provided." (*Id.*) Indeed, in a March 2019 letter, Armer's counsel criticized CSAA for making these requests, arguing that CSAA was attempting to "lowball" Armer by "disputing and denying that the collision caused her severe and permanent . . . pelvic injuries," that "Ms. Armer's records and imaging [show] in no uncertain terms that her injuries were directly related to the subject collision," and that "[y]ou do not need any additional information, other than what you have in order to tender the policy limits available for this loss." (Doc. 65-7 at 6, 8.)

CSAA ultimately responded to Armer's $100,000 settlement demand with a $17,103 counter-offer, explaining that it was unwilling to offer the full $100,000 in part because "the doctors . . . indicated her pelvic fractures looked old." (Doc. 65-7 at 3.)

II.     Procedural History

    A.     **Court Filings**

On May 10, 2019, Armer initiated this action by filing a complaint in Maricopa County Superior Court. (Doc. 1-3.) The complaint asserts claims for (1) breach of contract and (2) bad-faith denial of her claim, in violation of the covenant of good faith and fair dealing inherent in the insurance agreement. (*Id.* ¶¶ 20-41.)

On June 6, 2019, CSAA removed this action to federal court. (Doc. 1.) Afterward, the Court ordered the parties to submit a Rule 26(f) case management report. (Doc. 5.)

On July 16, 2019, the parties submitted their Rule 26(f) report. (Doc. 11.) Armer recounted her allegation that CSAA had effectively denied her claim in violation of her insurance policy. (*Id.* at 3.) CSAA's position was that it needed more medical records to evaluate whether Armer "had a pre-existing hip injury" at the time of the accident. (*Id.*)

    B.     **The Discovery Process**

        1.     Armer's Initial Expert Disclosures

In July 2019, Armer disclosed two expert reports to CSAA. (Doc. 66 at 3.) The first was a report from Dr. Michael Compton. (Doc. 65-6.) This report, which was prepared in September 2018, diagnosed Armer with a "[c]losed fracture of left side of symphysis pubis with routine healing," as well as attendant hip pain. (*Id.* at 2.) Notably, this report stated that the pelvic fracture had an "onset" date of January 31, 2018 (*i.e.,* the date of the car accident). (*Id.* at 3.) Based on the pelvic fracture, along with injuries to Armer's ribs, Dr. Compton concluded that Armer suffered "[p]ermanent impairment of whole person" totaling three percent. (*Id.* at 4.) Dr. Compton stated that this impairment would require a litany of future care, including repeated "physical therapy, pain management, and primary care." (*Id.* at 3.) This amounted to "ten visits per year with physical therapy for functional assessment and appropriate treatment," monthly pain

- 3 -

management appointments, and biannual primary care appointments. (*Id.*) Finally, due to the "pubic fracture leading to the subsequent gait dysfunction," "a walker would be considered to be reasonable." (*Id.*) All told, Dr. Compton expected Armer's future care to cost roughly $10,000 per year. (*Id.* at 3.)

The second expert report was from Dr. Gil Ortega. (Doc. 65-8 at 1-3.) This report, which was prepared in February 2019, generally agreed with Dr. Compton's assessment and, like Dr. Compton's report, attributed the pelvic fracture to the car crash: "Armer suffered multiple pelvic fractures . . . as a result of a motor vehicle crash on January 31, 2018." (*Id.* at 1.)

In November 2019, Armer disclosed a report from a third expert, Robert Underdown. (Doc. 66 at 3.) In this report, which is dated November 1, 2019, Underdown explained that he was retained to offer opinions concerning whether CSAA adhered to the standard of care and acted in good faith when handling Armer's claim. (Doc. 66-5 at 8-9.) Like Dr. Compton and Dr. Ortega, Underdown asserted in his report that "Ms. Armer sustained significant injuries as a result of the collision including fractures to her . . . pelvis." (*Id.* at 3.) In fact, Underdown stated that he had relied on the reports of Dr. Compton and Dr. Ortega in reaching his conclusions. (*Id.* at 7, 11.) In light of Armer's significant injuries, Underdown stated that "the value of [Armer's] claim is far in excess of the adverse parties' $25,000 policy limit and the additional $100,000 limit from [CSAA's] coverage" and that "it is more likely than not that a jury will give . . . Armer a significantly higher verdict [than her $100,000 policy limit], possibly in excess of $200,000.00." (*Id.* at 4, 7.) Ultimately, Underdown concluded that "CSAA . . . refused to make a reasonable offer to settle" and "did not conduct a reasonable investigation based upon all available information," which caused CSAA to adopt an "overkill strategy in handling this case" and put CSAA in the position of "spend[ing] an extraordinary amount to defend this claim when it may end up costing CSAA . . . a lot more than the original claim." (*Id.* at 7-8.)

…

### 2. CSAA's Expert Disclosures

Throughout 2019, CSAA repeatedly attempted to identify the medical provider that was in possession of the x-rays from Armer's December 2017 doctor visit. As of November 12, 2019—the date of Armer's independent medical evaluation ("IME"), which was conducted by Dr. John Bradway—the x-rays still had not been located. Accordingly, in his initial report issued following the IME (Doc. 66-8 at 1-9), Dr. Bradway concluded that "[m]ost of the questions I cannot answer at this time, because I do not have radiographic material for comparison." (*Id.* at 8.)[2]

At some point in November 2019, CSAA "was advised that it should redirect [its] subpoena to Banner MD Anderson Imaging Center" to obtain the x-rays. (Doc. 36 at 2.) CSAA's counsel did so and also sent an email to Armer's counsel requesting that Armer sign a release authorizing disclosure of the x-rays. (Doc. 66-6 at 2.) A few days later, Armer signed the release. (*Id.* at 1.)

At some point after January 7, 2020, CSAA obtained the x-rays. It then provided a copy of the x-rays to Dr. Bradway and provided another copy to Armer. (Doc. 66 at 5; Doc. 66-7 at 5-6.)

On January 14, 2020, Dr. Bradway provided a supplement to his initial report. (Doc. 66-8 at 13-15.) In this supplement, Dr. Bradway stated that the x-rays from Armer's pre-accident doctor visit

> clearly identify, on AP pelvis as well as oblique of the left hip, that there is a comminuted fracture of the pubic body and ramus near the pubic symphysis in the exact area later identified on the CT scan after the accident. ***Thus, there is with 100% certainty a fracture of the pelvis well prior to the accident in question***.

(Doc. 66-8 at 13, emphasis added.) In other words, "[t]his clearly demonstrates the left-sided pelvic fracture, for which she had multiple visits and some treatment after this accident, and was originally attributed to this motor vehicle accident . . . is actually a

---

[2] Similarly, in a supplemental report issued on January 3, 2020 (Doc. 66-8 at 10-12), Dr. Bradway reiterated that he "cannot age or date" the pelvic fracture depicted in Armer's post-accident imaging and that "it is critically important that we have some comparison to films prior to this incident. I am aware that these exist . . . ." (*Id.* at 11.)

preexisting issue. . . . If it was not called on a formal report, then, it was missed." (*Id.* at 14.) Additionally, Dr. Bradway opined that there was "frankly no evidence based on the ER evaluation that this pelvic fracture was even aggravated in any way." (*Id.* at 14.)

On January 29, 2020, Dr. Bradway issued a final supplement. (*Id.* at 16-18.) It acknowledged that the doctor who drafted the one-paragraph summary of the pre-accident x-rays "did not identify this fracture or report on it," even though "[t]he fracture is quite evident and clearly seen." (*Id.* at 17.) Dr. Bradway ultimately rejected the conclusion of both Dr. Compton and Dr. Ortega that Armer suffered a 3% whole body impairment, opining that whatever impairment Armer suffered "was not caused by this accident, [so] it does not qualify for permanent impairment." (*Id.* at 18.)

CSAA also retained Paul McGoldrick to serve as a bad-faith expert. (Doc. 66-10.) In a report issued on January 30, 2020, McGoldrick concluded—based on a review of Armer's medical records, Armer's experts' reports, and Dr. Bradway's reports—that "the handling of Ms. Armer's claims by CSAA was within generally accepted insurance practices." (*Id.* at 8.) In McGoldrick's view, "the primary reasons [Armer's] claim did not resolve prior to suit was a disagreement as to whether the pre-accident medical records for some period of time should have been provided and valuing the damages." (*Id.* at 5-6.) As for the medical records, McGoldrick stated that "[a]t a minimum, prudent claims handling would dictate that the carrier follow up with respect to the claimant's prior medical history" and CSAA had a reasonable basis for doing so here. (*Id.* at 6.) As for valuing Armer's damages, McGoldrick laid the blame at Armer's counsel's feet, because he "would not negotiate or accept anything less than a value of the full policy limits of $100,000." (*Id.*) According to McGoldrick, "CSAA's initial valuation . . . of approximately $20,000" in damages "was more than reasonable." (*Id.*)

3. <u>Armer's Rebuttal Disclosures</u>

Following receipt of Dr. Bradway's report and supplements, Armer retained Dr. Vikram Sobti to provide a rebuttal report. (Doc. 65-1.) In his report, which was issued in February 2020, Dr. Sobti acknowledged that the fracture depicted in Armer's post-accident

1 CT scan was "seen as a . . . fracture on [a] previous x-ray." (*Id.* at 2.) Nevertheless, Dr. Sobti opined that the car accident caused "worsening/further fracturing." (*Id.* at 2.)

Dr. Compton and Dr. Ortega also issued supplemental reports in February 2020. (Doc. 65-2 [Dr. Compton]; Doc. 65-3 [Dr. Ortega].) Each report concedes that Armer did, in fact, have a fractured pelvis at the time of the car accident. (Doc. 65-2 at 1 ["It appears that Ms. Armer had a prior fracture . . . ."]; Doc. 65-3 at 1 ["[I]t does appear that the radiographs . . . done on 12/18/2017 do demonstrate left sided pelvic fractures. Therefore, the pelvic fractures predated the accident on 01/31/2018."].) Nevertheless, each report opines that the crash "exacerbat[ed]" this injury. (*Id.*)

Finally, Underdown issued a "rebuttal" report in February 2020. (Doc. 65-4.) Based on Dr. Sobti's opinion that Armer's pelvic injury "is a new injury as a result of the accident," Underdown reiterated his conclusion that CSAA's $17,103 offer was a "low ball" settlement constituting bad faith. (*Id.* at 4-9.)

C. **This Motion**

On March 30, 2020, CSAA filed its motion, which is entitled "motion to strike rebuttal reports and limit the testimony of plaintiff's expert." (Doc. 65.)

On April 13, 2020, Armer filed a response. (Doc. 66.)

On April 20, 2020, CSAA filed its reply. (Doc. 67.)

On June 3, 2020, the Court issued a tentative order. (Doc. 88.)

On June 9, 2020, the Court heard oral argument. (Doc. 89.)

**ANALYSIS**

I. <u>CSAA's Motion To Exclude The "Rebuttal" Opinions Of Armer's Experts</u>

In its "motion to strike," CSAA seeks to preclude Armer's medical experts (Drs. Compton, Ortega, and Sobti) and Armer's bad-faith expert (Underdown) from offering the opinion that the car accident on January 31, 2018 caused Armer to suffer an exacerbation of a pre-existing pelvic fracture. (Doc. 65 at 3-6.) In CSAA's view, although each expert characterized this as a "rebuttal" or "supplemental" opinion in his February 2020 report, it is not a rebuttal opinion at all—instead, it constitutes an improper attempt to assert a new

theory of liability that should have been included in Armer's original expert disclosures. (*Id.*) Armer disagrees, arguing that (1) a "motion to strike" is not an appropriate vehicle for raising this sort of challenge, (2) on the merits, her experts' opinions on exacerbation qualify as proper rebuttal evidence, and (3) alternatively, any disclosure error on her part was substantially justified or harmless. (Doc. 66 at 10-17.)

A. **Applicable Standard**

As an initial matter, the parties disagree as to the applicable standard. CSAA describes its motion as a request to "strike" Armer's experts' rebuttal opinions. (Doc. 65.) Armer responds that motions to strike are governed by Rule 12(f), which only authorizes the striking of pleadings. (Doc. 66 at 10.)

Armer's semantic argument lacks merit. CSAA's intention is clear—it wishes to preclude Armer's experts from testifying that her pelvic fracture was exacerbated by, rather than created by, the January 2018 crash, on the ground that this opinion was not timely disclosed and does not qualify as a "rebuttal" opinion. (Doc. 65.)

The disclosure of expert testimony is governed by Rule 26(a)(2) of the Federal Rules of Civil Procedure. Under Rule 26(a)(2)(D), "[a] party must make these disclosures at the times and in the sequence that the court orders." *Id.*

Here, the Rule 16 scheduling order required Armer, as "[t]he party with the burden of proof," to "provide full and complete expert disclosures . . . no later than November 1, 2019." (Doc. 13 at 3.) The scheduling order further stated that the expert reports disclosed by this date "must set forth 'the testimony the witness is expected to present during direct examination, together with the reasons therefor.' Full and complete disclosures of such testimony are required on the dates set forth above. Absent extraordinary circumstances, parties will not be permitted to supplement expert reports after these dates." (*Id.* at 4, citation omitted.) Finally, the scheduling report also set a later deadline—ultimately extended to February 28, 2020 (Doc. 37 at 2)—for Armer to make "rebuttal expert disclosures" but clarified that such disclosures "shall be limited to responding to opinions stated by the opposing party's experts." (Doc. 13 at 3.)

Accordingly, the first question before the Court is whether the opinion that the car accident caused Armer to suffer an exacerbation of a pre-existing pelvic fracture is properly characterized as a "rebuttal" opinion. If so, CSAA's motion must be denied because all four of Armer's experts disclosed this opinion in the supplemental/rebuttal reports they issued in mid-February 2020 (*i.e.,* before the February 28, 2020 deadline for the disclosure of rebuttal opinions). However, if this opinion does not qualify as a "rebuttal" opinion, then it must be considered untimely (because the scheduling order created a November 1, 2019 deadline for Armer to make her initial expert disclosures). Such an untimely disclosure, in turn, implicates Rule 37(c)(1), which provides that "[i]f a party fails to provide information . . . as required by Rule 26(a) . . . , the party is not allowed to use that information . . . at a trial, unless the failure was substantially justified or is harmless. *See generally Yeti By Molly, Ltd v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("Rule 37(c)(1) gives teeth to [Rule 26(a)'s expert disclosure] requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed.").

### B.  Whether The Exacerbation Opinion Disclosed In February 2020 Qualifies As A "Rebuttal" Opinion

Rule 26(a)(2)(D)(ii) defines a "rebuttal" opinion as one "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Put another way, "[t]he function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir.2006) (citation omitted). Here, although it presents a fairly close call, as these issues often do,[3] the opinions asserted by Armer's experts in February 2020 on the subject of exacerbation do not qualify as rebuttal opinions—instead, they are opinions that Armer was required to disclose by the initial expert disclosure deadline of November 1, 2019.

---

[3]  *See generally Estate of Goldberg v. Goss-Jewett Co., Inc.*, 2019 WL 8227387, *2 (C.D. Cal. 2019) ("Deciding whether an opinion is properly rebuttal in nature is largely a factual determination that is entrusted to the sound discretion of the district court.") (internal quotation omitted); *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 685 (5th Cir. 1991) ("Rebuttal must be kept in perspective; it is not to be used as a continuation of the case-in-chief. The call by the district court . . . frequently is a very close one.").

The Court reaches this conclusion for two related but distinct reasons. First, Armer's experts fundamentally don't seek to *contradict* or *rebut* the opinion of CSAA's expert, Dr. Bradway, that Armer had a pre-existing pelvic fracture at the time of the accident. Rather, Armer's experts now seek to *adopt* that opinion as a replacement for the opinion set forth in their initial reports, which was that the accident caused the fracture, and then utilize the adopted opinion as the springboard for an entirely new theory of causation (*i.e.,* Armer had a pelvic fracture at the time of the accident but the accident exacerbated it, causing further damage). Because the exacerbation opinion is one that Armer would be offering as part of her case-in-chief, it cannot be characterized as a rebuttal opinion. *See, e.g., Marmo*, 457 F.3d at 759 ("[R]ebuttal evidence may be used to challenge the evidence or theory of an opponent—and not to establish a case-in-chief."); *In re Apex Oil Co.*, 958 F.2d 243, 245 (8th Cir. 1992) ("The exclusion of rebuttal testimony was also held proper where the testimony should have been elicited during the case in chief."); *SIL-FLO, Inc. v. SFHC, Inc.,* 917 F.2d 1507, 1515 (10th Cir. 1990) ("proffered rebuttal testimony" was "properly excluded" because it "was really an attempt by [the plaintiff] to introduce or interpret exhibits more properly part of its case-in-chief"); *Amos v. Mikita U.S.A., Inc.*, 2011 WL 43092, *2 (D. Nev. 2011) (concluding that defendant violated scheduling order by waiting until the rebuttal deadline to disclose its expert's opinions concerning "a new, alternative theory of the fire's origin" because "the subject of the causation of the fire is an expected and anticipated portion of Defendant's case-in-chief, and therefore [the expert] cannot be a rebuttal expert or anything analogous to a rebuttal expert").

During oral argument, Armer argued that her experts' opinions on exacerbation should be deemed proper rebuttal because Dr. Bradway didn't limit himself to the opinion that the pelvic fracture was a pre-existing injury—he went further and opined that the accident didn't exacerbate that injury. According to Armer, it is this component of Dr. Bradway's report that injected a new theory into the case and opened the door for her to offer rebuttal. Although this argument has some surface appeal, it fails upon close scrutiny.

The opinion that the accident exacerbated a pre-existing fracture (*i.e.,* Armer's experts' new theory) is impossible to reconcile with the opinion that the accident caused the fracture (*i.e.,* Armer's experts' old theory). Whatever the scope of rebuttal, it cannot be so expansive as to allow a party to discard its initial theory of causation and adopt a new, contradictory theory that would be introduced during its case-in-chief. *See, e.g., Facciola v. Greenberg Traurig LLP*, 2012 WL 1242382, *1 (D. Ariz. 2012) ("Rebuttal reports cannot be used to introduce new theories or to correct oversights in the plaintiffs' case in chief."); *Stephenson v. Wyeth LLC*, 2011 WL 4900039, *1 (D. Kan. 2011) ("A party . . . may not use a rebuttal expert to introduce new legal theories.").

Second, it should have come as no surprise to Armer that CSAA would take the position, in its expert disclosures, that the car accident didn't cause her pelvic fracture. This issue was the subject of intense discussion during the parties' pre-suit settlement negotiations and functioned as the primary roadblock to settlement. Additionally, it remained a live issue after Armer filed suit in May 2019—CSAA made a point of raising it in the parties' Rule 26(f) report and kept hounding Armer's counsel for releases and other medical information during the discovery process. These circumstances amplify why it was imperative for Armer to address the pre-existing injury issue in her initial expert disclosures, as opposed to addressing it through the guise of "rebuttal" opinions not disclosed until after she received CSAA's expert disclosures. *See, e.g., Faigin v. Kelly*, 184 F.3d 67, 85-86 (1st Cir. 1999) (affirming disallowance of plaintiff's rebuttal evidence because it was intended to address a long-known defense: "When a party knows that a contested matter is in the case, yet fails to address it in a timely fashion, he scarcely can be heard to complain that the trial court refused to give him a second nibble at the cherry. This principle has particular bite where, as here, nothing new or unanticipated surfaced during the defense case that even arguably changed the topography of the battlefield."). *Compare Atencio v. Arpaio*, 2015 WL 11117187, *7 (D. Ariz. 2015) (allowing rebuttal evidence because the court did "not find that Plaintiffs should have anticipated" aspects of the defendants' case).

C.     **Substantially Justified Or Harmless**

Rule 37(c)(1) provides that when, as here, expert opinions are not timely disclosed, they are subject to exclusion unless the disclosure error was "substantially justified or is harmless."

Here, the error was not substantially justified. The December 2017 x-ray isn't a long-lost piece of evidence that was beyond Armer's reach. Moreover, Armer had ample notice that the x-ray might be critical to these proceedings. A doctor at the emergency room remarked, almost immediately after the accident, that Armer's pelvic fracture might be old and CSAA's counsel repeatedly asked for the x-ray during the pre-suit negotiation process, only to be criticized by Armer's counsel for having the temerity to request more medical records. (Doc. 65-7 at 6, 8 ["You do not need any additional information, other than what you have in order to tender the policy limits available for this loss."].) Thus, even though it might be reasonable, in the abstract, for a party to assume that a doctor's summary of an x-ray is accurate and not bother to retrieve and review the underlying films (which is the justification that Armer's counsel proffered during oral argument), it was not reasonable to do so under the facts of this case.

As for harmlessness, Armer contends that CSAA has suffered no prejudice from the late disclosure because (1) "any surprise to [CSAA] was minimal best, as [Armer] has always taken the position that the pelvic injury [she] suffered in the collision was an acute condition," (2) CSAA hasn't noticed Dr. Sobti's deposition or sought leave to rebut Dr. Sobti's opinions, (3) CSAA will have an opportunity to cross-examine Dr. Sobti at trial, and (4) a trial date hasn't been set, so the timing of her disclosures has not caused any disruption. (Doc. 66 at 15-16.) In response, CSAA argues the new theory *is* surprising, because it had not previously "seen any indication from [Armer] that she would claim an exacerbation of a pre-existing injury—and in fact [Armer] vehemently denied it," and granting leave to obtain and disclose further opinions would only "risk . . . perpetuating the circular quagmire." (Doc. 67 at 6-7.) When pressed to provide more specifics during oral argument, CSAA's counsel stated that responding to the new exacerbation opinions would

require an extension of the expert disclosure deadlines (which have all expired), the solicitation of as many as three new opinions from experts (including the retention of a new expert with expertise in radiology), and the expenditure of thousands of dollars in additional expert-related costs and fees.

On this record, Armer has not met her burden of demonstrating harmlessness. *Yeti by Molly*, 259 F.3d at 1107 ("Implicit in Rule 37(c)(1) is that the burden is on the party facing sanctions to prove harmlessness."). The belated change in Armer's theory isn't some modest refinement. Proving that a 72-year-old's already fractured pelvis was exacerbated in a car accident is a much different animal than seeking damages in a case where the accident caused the fracture. Moreover, the bad-faith analysis in this case turns in part on whether CSAA was justified in seeking more information about the pelvic injury before deciding to accept Armer's policy-limits settlement demand. Had Armer properly and timely disclosed that she was proceeding under an exacerbation theory, CSAA would have pursued a different defense strategy, had its experts focus on different issues, and hired different experts with different areas of expertise.

During oral argument, Armer asserted for the first time that, because her experts' exacerbation opinions are critical to her case, their exclusion would raise constitutional concerns and the Court must therefore make a finding of willfulness or bad faith before excluding them. This argument is unavailing. First, Armer conceded in her response to CSAA's motion that the "substantially justified or harmless" standard applies in this circumstance. (Doc. 66 at 15 ["[S]hould the Court be inclined to find that the scope of Plaintiff's experts' rebuttal reports was somehow improper, the Court may find that Plaintiff's rebuttal reports were substantially justified or harmless such that the reports need not be stricken."]). A party may not raise new claims during oral argument that contradict the claims made in the party's motion papers. Second, Armer's new argument is wrong on the merits. The Ninth Circuit has specifically held that a finding of bad faith or willfulness isn't required before an expert opinion may be excluded under Rule 37(c)(1) due to untimely disclosure. *See, e.g., Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175,

1180 (9th Cir. 2008) ("[W]e reject the notion that the district court was required to make a finding of willfulness or bad faith . . . . [T]he portion of Rule 37 relied on by the district court has been described as 'a self-executing, automatic sanction to provide a strong inducement for disclosure of material.' The implementation of the sanction is appropriate 'even when a litigant's entire cause of action . . . [will be] precluded.'") (citation omitted). Third, Armer has not, in any event, demonstrated that her case will crumble without the exacerbation opinions. Armer's experts have opined that she suffered other injuries during the accident and CSAA is not seeking to exclude their opinions as to those other injuries.

The bottom line is that it would not be harmless to allow Armer to belatedly change theories under these circumstances. Such a change would require the Court to retroactively extend the expired expert-disclosure deadlines and would require CSAA to spend thousands of dollars retaining new experts and soliciting new expert opinions, which might in turn trigger new rounds of expert depositions. Even if it might be possible to enter a cost-shifting order requiring Armer to pay all of CSAA's expenses associated with these additional steps (which Armer suggested for the first time during oral argument), this still would not ameliorate all of the harm. *Cf. Hoffman*, 541 F.3d at 1180 (affirming district court's determination that late disclosure of damage calculations was not harmless and therefore justified exclusion under Rule 37(c)(1): "Later disclosure of damages would have most likely required the court to create a new briefing schedule and perhaps re-open discovery, rather than simply set a trial date. Such modifications to the court's and the parties' schedules supports a finding that the failure to disclose was not harmless."). As one court put it under analogous circumstances:

> To rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could "supplement" existing reports and modify opinions previously given. This practice would surely circumvent the full disclosure requirement implicit in Rule 26 and would interfere with the Court's ability to set case management deadlines, because new reports and opinions would warrant further consultation with one's own expert and virtually require new rounds of depositions. That process would hinder rather than facilitate settlement and

the final disposition of the case.

*Beller ex rel. Beller v. United States*, 221 F.R.D. 689, 695 (D.N.M. 2003).

Accordingly, CSAA's motion to preclude Dr. Compton, Dr. Ortega, Dr. Sobti, and Underdown from offering the opinion that the car accident on January 31, 2018 caused Armer to suffer an exacerbation of a pre-existing pelvic fracture will be granted.

II.     Underdown's Statements Concerning The Value Of Armer's Damages

CSAA also seeks to preclude Armer's bad-faith expert, Underdown, from "rendering opinions as to the value of [Armer's] personal injury claim." (Doc. 65 at 6-7, capitalization omitted.) Presumably, CSAA is referring to the statements in Underdown's report that "the value of [Armer's] claim is far in excess of the adverse parties' $25,000 policy limit and the additional $100,000 limit from [CSAA's] coverage" and that "it is more likely than not that a jury will give . . . Armer a significantly higher verdict [than her $100,000 policy limit], possibly in excess of $200,000.00." (Doc. 66-5 at 4, 7.) CSAA argues that such opinions are improper because (1) they usurp the role of the jury as the factfinder and (2) they "are no more than statements that Mr. Underdown accepts certain doctors' opinions over others (despite his lack of medical training)." (Doc. 65 at 6-7.) Armer responds that Underdown's opinions "do not usurp the role of the jury by trying to offer the value of Ms. Armer's damages" and that Underdown merely seeks to "opine[] that CSAA's failure to offer policy limits fell below the standard of care for a prudent insurer, when faced with catastrophic and acute injuries of its insured." (Doc. 66 at 14.)

This appears to be an instance of the parties taking past each other. On the one hand, CSAA is correct that Underdown is not qualified to opine about the value of Armer's damages (and, relatedly, the amount of money a hypothetical jury would award her as compensation for those damages). "The party offering expert testimony has the burden of establishing its admissibility." *Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012). A threshold requirement under Rule 702 is that the proffered expert be "qualified . . . by knowledge, skill, experience, training, or education." Here, Underdown explains in his report that his qualifications consist of

working "in the insurance industry for over 30 years," "purchasing insurance for a number of public and private corporations," and being "currently licensed as an insurance producer in the State of Arizona." (Doc. 66-5 at 2.) Although such qualifications may be sufficient for Underdown to offer opinions about whether CSAA complied with the applicable standards in the insurance industry,[4] it doesn't follow that Underdown is also qualified to testify about the value of Armer's damages. As noted in Part I above, the valuation question in this case turns in part on complex, disputed medical issues. Working in the insurance industry for 30 years doesn't qualify Underdown to offer opinions on those issues.

On the other hand, it would be improper to preclude Underdown from making any mention of the perceived value of Armer's damages. Underdown's ultimate opinion in this case—which CSAA hasn't moved to exclude—is that CSAA "fell below the standard of care expected of insurance companies in handling the claims of its policyholders" because CSAA committed "several breaches of the Arizona Unfair Claims Practices Act (ARS 20-461) and Arizona Unfair Claims Settlement Practices Regulation (R20-6-801)." (Doc. 66-5 at 9.) One of the specific breaches identified in Underdown's report is a violation of the duty to "attempt, in good faith, to effectuate a prompt, fair and equitable settlement of [a claim] in which liability and damages were more than reasonably clear." (*Id.* at 7.) It would be impossible for Underdown to explain to the jury why he reached this opinion without discussing the value of the underlying claim—after all, a violation occurs only if "damages were more than reasonably clear."

Tellingly, CSAA's bad-faith expert, McGoldrick, offers the ultimate opinion in his report "that the handling of Ms. Armer's claims by CSAA was within generally accepted

---

[4] *See generally Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (emphasizing that Rule 702 "contemplates a broad conception of expert qualifications" and holding that plaintiff's expert was qualified "to testify about claims adjustment standards in the context of an insurance bad faith claim" in light of the expert's "twenty-five years' experience working for insurance companies and as an independent consultant") (citation and emphasis omitted); *Temple v. Hartford Ins. Co. of Midwest*, 40 F. Supp. 3d 1156, 1161 (D. Ariz. 2014) ("Both Arizona law and Ninth Circuit law recognize that experts in the area of insurance claim handling are proper [and] that they may testify regarding the application of industry standards to claim handling . . . .").

- 16 -

insurance practices" (Doc. 66-10 at 8) and seeks to justify this opinion by asserting, *inter alia*, that "CSAA's initial valuation . . . of approximately $20,000 . . . was more than reasonable." (*Id.* at 6.) It is difficult to reconcile CSAA's objection to Underdown's mention of the perceived value of Armer's damages, and his incorporation of that perceived value into his ultimate bad-faith opinion, with the fact that CSAA's expert engaged in the exact same sort of analysis (albeit while reaching a different conclusion).

Given this backdrop, Underdown will be allowed to testify at trial that he assumed, for purposes of his standard-of-care opinions, that Armer's damages greatly exceeded $125,000 and may have exceeded $200,000, but he will not be allowed to go further and pass off those assumptions as his own opinions. It is perfectly permissible for an expert to rely on assumptions when formulating opinions. *See* Fed. R. Evid. 702, advisory committee notes to 2000 amendments ("The language 'facts or data' is broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence."). Disagreement with an expert's assumptions does not, in general, provide a basis for excluding the expert's testimony. *See, e.g., Marsteller v. MD Helicopter Inc.*, 2018 WL 3023284, *2 (D. Ariz. 2018) ("The challenges to Equals' opinions and the weaknesses in his assumptions are issues to be explored on cross-examination."); *Biltmore Assocs., L.L.C. v. Thimmesch*, 2007 WL 5662124, *6 (D. Ariz. 2007) ("Although Jenkins is not qualified to offer an opinion as to whether the shareholder claims ever existed, she is permitted to assume that they existed and base her damages calculation on that assumption."); *Flying Fish Bikes, Inc. v. Giant Bicycle, Inc.*, 2014 WL 12621218, *1 (M.D. Fla. 2014) (drawing a distinction between "an expert's unquestioned ability to render an opinion based on assumed facts and an opposing party's ability to factually disprove the expert's factual assumptions" and emphasizing that "[t]he prospect that the opposition might disprove assumed facts . . . presents no barrier to the admissibility of an expert's opinion").

To be sure, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap

between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). *See also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) ("*Joiner* requires an expert to justify a foundational assumption or refute contrary record evidence."). Nevertheless, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). *See also* Fed. R. Evid. 702, advisory committee note to 2000 amendments ("[P]roponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . . The evidentiary requirement of reliability is lower than the merits standard of correctness.") (citation and internal quotation marks omitted). Here, Underdown's assumptions about the value of Armer's damages have a sufficient foundation—they are based on the opinions of Armer's other experts—and CSAA's disagreement with those assumptions is fodder for cross-examination at trial, not exclusion.

Accordingly, **IT IS ORDERED** that CSAA's motion to preclude expert testimony (Doc. 65) is **granted in part and denied in part**.

Dated this 10th day of June, 2020.

_____
Dominic W. Lanza
United States District Judge